**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.:  2:20-cv-04803** |
| **JOEL STOHLMAN, RICARDO RICHARDSON, GARY WOLFF, and EDWARD HEIL,** | **Jury Trial Demanded** |
| **Defendants.** | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC" or "Commission") alleges as follows against defendants Joel Stohlman ("Stohlman"), Ricardo Richardson ("Richardson"), Gary Wolff ("Wolff"), and Edward Heil ("Heil") (collectively, "Defendants"):

## SUMMARY OF THE ACTION

1.     This matter involves Defendants' scheme to manipulate the market for the common stock of three microcap companies:  AI Document Services, Inc. ("AIDC"), Creative Edge Nutrition, Inc. ("FITX"), and Interactive Health Network ("IGRW" and collectively, the "Issuers").

2.     As part of the scheme, Defendants secured control of all or a majority of the Issuers' stock, which enabled them to manipulate the stock price for each of the Issuers. Defendants disguised their control in the Issuers' stocks by creating nominee accounts to avoid disclosing their stock positions as required by SEC rules and regulations.

3.     Starting as early as November 2014, Defendants recruited an individual whom they believed was a stock promoter aligned with a network of corrupt registered representatives willing to arrange for the purchase of large volumes of the Issuers' stock in exchange for cash kickbacks.  In reality, the individual was an undercover agent of the Federal Bureau of Investigation (the "UCA").

4.     Defendants intended to engage in pre-arranged matched orders with the UCA—trade orders arranged and designed to be executed between Defendants and the UCA, but to falsely appear to the public as a market driven transaction—to create an illusion of genuine investor demand for the Issuers' stock.  Specifically, the UCA's supposed group of registered representatives would purchase Defendants' stocks at the pre-arranged sizes, times, and prices through their unsuspecting clients' discretionary accounts in exchange for receiving 40% of the gross proceeds from the stock sales.  Defendants also intended to "prime the pump" by aggressively promoting the Issuers.  Once the Issuers' stock price was artificially inflated, Defendants intended to dump the millions of shares that they controlled in the open market.

5.     In furtherance of this scheme, Defendants paid the UCA to purchase shares in AIDC and FITX to create the appearance of market interest, induce public purchases of the stocks, and, ultimately, increase the stocks' trading price.  However, the SEC suspended trading in the common stock of the Issuers on February 19, 2016, before Defendants' broader campaign of manipulative trading and promotional activities to inflate the Issuers' stock prices could be implemented.

6.     As a result of the conduct described in this Complaint, Defendants violated, and unless enjoined will continue to violate, Section 17(a)(1) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)(1)], Sections 9(a)(1) and 10(b) of the Securities Exchange

Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78i(a)(1) and 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## JURISDICTION AND VENUE

7.      The Commission brings this action to enjoin such transactions, acts, practices, or courses of business and to seek civil penalties and an order prohibiting Defendants from participating in any offering of a penny stock.  The Commission further seeks any other relief as the Court may deem just and appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

8.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9.      Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions, and courses of business alleged in this Complaint—including bank account payments and phone calls—occurred within the Eastern District of Pennsylvania, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails.

## DEFENDANTS

10.     **Joel Stohlman**, age 56, resides in Suwanee, Georgia.  Stohlman is a stock promoter and purports to provide consulting services to publicly traded companies.  At the time of the conduct discussed herein, Stohlman controlled a substantial amount of the Issuers' stock.

11.    **Ricardo Richardson**, age 50, resides in Buford, Georgia.  Richardson is a stock promoter and purports to provide consulting services to publicly traded companies.  At the time of the conduct discussed herein, Richardson controlled a substantial amount of the Issuers' stock.

12.    **Gary Wolff**, age 78, resides in New York, New York.  Wolff is an attorney.  In 2012, Wolff was suspended from appearing or practicing before the Commission pursuant to SEC Rule 102(e) due to his suspension from practicing law in New York.  *See In the Matter of Gary B. Wolff, Esq.*, Exchange Act Release No. 67749 (August 29, 2012).  At the time of the conduct discussed herein, Wolff controlled a substantial amount of the Issuers' stock.

13.    **Edward Heil**, age 70, resides in Pearland, Texas.  Heil is an accountant.  In January 2005, the Commission alleged that Heil, while acting as a CEO of a publicly traded company, engaged in a scheme involving a false press release, financial fraud and market manipulation.  *See SEC v. Heil, et al.*, 05 Civ. 5852 (E.D.N.Y. 2005).  In that matter, Heil was enjoined from violating the antifraud provisions of the federal securities laws and agreed to a 10-year officer and director bar.  Based on the same misconduct, Heil also accepted a bar from practicing before the Commission pursuant to SEC Rule 102(e) as an accountant.  *See In the Matter of Edward A. Heil*, Exchange Act Release No. 5330 (February 17, 2006).  At the time of the conduct discussed herein, Heil controlled a substantial amount of the Issuers' stock.

## RELATED ENTITIES

14.    **AIDC** is a Delaware corporation with its principal offices in Atlanta, Georgia that purports to operate a restaurant and food products business.  AIDC's stock was quoted and traded on OTC Link, whose parent company is OTC Markets Group, Inc., until the SEC issued an order suspending trading in AIDC's securities on February 19, 2016.  AIDC's common stock is registered with the SEC under Section 12(g) of the Exchange Act.

4

15.     **FITX** is a Nevada corporation with its principal offices in Beverly Hills, California that purports to be a nutritional supplement company.  FITX's stock was quoted and traded on OTC Link until the SEC issued an order suspending trading in FITX's securities on February 19, 2016.  FITX's common stock is not registered with the SEC.

16.     **IGRW** is a Nevada corporation with its principal offices in Reno, Nevada that purports to manufacture, market, and sell high quality lifestyle products and nutraceuticals. IGRW's stock was quoted and traded on OTC Link until the SEC issued an order suspending trading in IGRW's securities on February 19, 2016.  IGRW's common stock is not registered with the SEC.

## FACTS

### Background

17.     Starting as early as November 2014, Defendants and the UCA started to have detailed discussions about manipulating the market for, and price of, the common stock for each of the Issuers.

18.     Defendants told the UCA that they directly controlled, or controlled through nominee accounts, all of AIDC's stock in the public float, and approximately 50% of FITX's and IGRW's stock, which put them in a position to manipulate the stock price for each of these companies.

19.     The UCA, in turn, told Defendants that his group of corrupt registered representatives had control of their customers' discretionary accounts and would purchase Defendants' stock through those accounts and park it for a substantial period of time.  In exchange for effecting these trades, Defendants agreed to pay the UCA kickbacks equal to 40% of the gross proceeds from the stock sales.

20.     To inflate the price of the Issuers' stock, Defendants engaged in deliberate acts in order:  (1) to create an illusion of genuine investor demand for each stock through pre-arranged matched orders; and (2) to tout the Issuers through an aggressive promotional campaign in order to "prime the pump."  Once the Issuers' stock price was artificially inflated, Defendants intended to dump the millions of shares that they controlled in the open market.

### Defendants' Attempts to Disguise Their Ownership of the Issuers

21.     Defendants also discussed, among other things, disguising their ownership of their shares as well as the planned proceeds received from the illicit trading by:  (i) using individual nominees and nominee corporations, (ii) establishing international business companies with nominee owners and officers, and (iii) opening and maintaining foreign bank and brokerage accounts.

22.     Defendants were particularly concerned about filing SEC Schedule 13D or 13G forms ("beneficial ownership reports"), which are intended to provide information about individuals who have significant holdings in publicly traded companies.  The ownership of over 5% of a publicly traded stock is considered significant ownership and reporting this to the SEC for public disclosure is a requirement.

23.     At least Stohlman and Richardson established the company FDQ, Inc. ("FDQ") with a nominee officer to pool their shares of the Issuers' stock.  Similarly, Heil deposited shares in at least two separate entity accounts that he controlled, P&E Group, Inc. and GCND, Inc. These Defendants agreed to transfer shares to these accounts gradually to conceal that they controlled more than 5% of the Issuers' stock and avoid filing the required beneficial ownership reports.

## Defendants' Pre-Arranged Matched Orders and Broker Kickbacks

24.     To create the appearance of active interest in the Issuers' securities, Defendants intended to engage in pre-arranged matched orders with the UCA's supposed network of corrupt registered representatives.  Defendants agreed to pay the UCA a 40% kickback for retail purchases of the Issuers' stock, keeping the remainder as their profit.

25.     Each Defendant agreed to coordinate their stock orders with the UCA at substantially the same sizes, time, and prices.

26.     In one call, for instance, both Richardson and Stohlman discussed with the UCA the price points at which they wanted to sell their shares.  For AIDC, Stohlman stated that due to the 40% fee they had to pay the UCA, Defendants wanted the price to be between $0.60 and $0.80.  AIDC shares were trading at approximately $0.10 at that time.

27.     Defendants agreed among themselves and did open accounts and deposit their shares at one broker-dealer to more easily coordinate their manipulative trading.

28.     To ensure the pre-arranged matched orders could be executed as intended, Defendants and the UCA planned small "test trades" of the Issuers' shares that the UCA would purchase.

29.     For instance, in a February 3, 2016, email, Heil, Wolff, and the UCA discussed executing a $5,000 AIDC trade the next day to make sure that the group's mechanics were in place "before they went big."

30.     The UCA asked whether Heil or Wolff were available the next day to coordinate the sale of their position.  Soon afterwards, Heil responded, copying Wolff, and stated that one of them would be available to engage in the matched orders.

31.     Stohlman, Richardson, and Wolff coordinated with each other to determine the particulars of how the group would execute the test trades.

32.     On February 4, 2016, Stohlman told the UCA that Wolff would execute the matched orders of FITX and IGRW shares, and that Richardson would sell the AIDC shares at the pre-arranged size, time, and price.  Stohlman stated that AIDC stock was trading "$0.065 by $0.11" per share.  The UCA responded that, in order to make sure his brokers bought Stohlman's stock, he would direct his brokers to purchase 50,000 AIDC shares at $0.10 per share.  Later, Richardson called the UCA and stated he submitted the AIDC order.

33.     That same day, Wolff and the UCA discussed the test trades for FITX and IGRW, which would also involve selling approximately $5,000 worth of each stock.  The UCA stated that for FITX, the current offer was $0.004 per share and his brokers would bid $0.0038 per share for 1.3 million shares.

34.     Wolff and the UCA also agreed that, for IGRW, Wolff would offer 12.9 million shares at $0.00039 per share.

35.     Following these calls, the FBI, in coordination with the UCA, placed orders to buy 50,000 shares of AIDC for $0.0985 per share and 1,300,000 shares of FITX for $0.0038 per share.  As planned, Defendants also placed orders to sell stock at the prearranged quantities and prices.  A portion of the pre-arranged, matched orders executed.

36.     Defendants paid the UCA the agreed-upon kickbacks in connection with the pre-arranged matched orders.

37.     On February 5, 2016, Wolff emailed the UCA stating that the kickback for the FITX trade would be wired soon.  Shortly thereafter, Wolff sent a wire of approximately

$2,000—equaling 40% of sale proceeds from the FITX test trade—to a bank account controlled by law enforcement located in the Eastern District of Pennsylvania.

38.     On February 16, 2016, Richardson directed a payment from an FDQ bank account of approximately $2,000—representing the kickback for the AIDC trade—to be sent to the same bank account.

### Defendants' Promotional Campaign to "Prime the Pump"

39.     Contemporaneous with the pre-arranged matched orders, Defendants planned to commence a promotional campaign that would include causing the company to release corporate news in order to "prime the pump."

40.     Defendants agreed that the UCA would pay a stock promoter (the "Stock Promoter") to widely distribute investor newsletters through "email blasts," touting the Issuers in conjunction with the corporate press releases.

41.     Defendants' coordination of the pre-arranged matched orders with the promotional campaign intended, at the very least, to create the appearance that there was market interest in the Issuers' stock—when, in reality, there was little or no market interest—to provide cover for the UCA's supposed registered representatives in purchasing a substantial amount of what were previously illiquid shares.

42.     Defendants agreed to supply the UCA with the Issuers' press releases before they were made public in order to coordinate the news with the Stock Promoter's planned releases.

43.     On February 11, 2016, the UCA emailed Stohlman, Richardson, Heil, and Wolff, asking about the status of the press releases.  Richardson responded by stating he would send the press releases to the UCA by the next day.

44. Heil previously had told the UCA that IGRW shares were not trading because the company was delinquent in certain filings and fees required by OTC Link. Thus, in the February 11, 2016, email, the UCA also asked whether IGRW would be trading soon. Heil responded, copying everyone on the original email, stating that Wolff would be working with Stohlman to "get IGRW current."

45. On February 15, the Stock Promoter sent the UCA three emails, each attaching a draft stock promotion of AIDC, FITX, and IGRW, which Defendants knew would be widely distributed by email.

46. On February 16, 2016, in two separate email chains, Defendants sent the UCA ten nonpublic press releases for AIDC and five press releases for FITX. Also, Richardson called the UCA and told him to proceed with the IGRW promotion because the stock would be trading soon.

47. On February 18, 2016, Defendants caused the press releases to be issued by the Issuers after the market closed. In conjunction with the issuance of these press releases, the Stock Promoter sent out the email blasts promoting AIDC, FITX, and IGRW.

48. The UCA conveyed to the Defendants that, once the market opened the next day, he would begin to buy their stock through the pre-arranged matched orders.

49. The UCA, however, never intended to purchase any more stock given that the SEC had planned to suspend trading in the securities of the Issuers before the market opened on February 19, 2016.

50. On the morning of February 19, 2016, the SEC did suspend trading, and in such manner, the larger manipulative scheme involving millions of the Issuers' shares controlled by Defendants was prevented.

## **Defendants Violated the Federal Securities Laws**

51.     The common stock of the Issuers were securities within the meaning of the Securities Act and Exchange Act.

52.     Defendants, directly or indirectly, engaged in the offer and sale of securities by use of the means or instruments of transportation or communication in interstate commerce, the instrumentalities of interstate commerce, or by use of the mails.

53.     Defendants, directly or indirectly, engaged in acts, schemes, or artifices to defraud through their intended and actual pre-arranged matched orders in the securities of the Issuers.

54.     Defendants, directly or indirectly, knowingly or recklessly engaged in these acts, schemes, or artifices to defraud.

55.     Defendants, directly or indirectly, engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person through their intended and actual pre-arranged matched orders in the securities of the Issuers.

56.     Defendants, directly or indirectly, knowingly or recklessly engaged in these fraudulent acts, practices, or courses of business.

57.     Defendants, directly or indirectly, effected transactions in a security which involved no change in the beneficial ownership thereof for the specific purpose of creating a false or misleading appearance of active trading in such security or the market for such security.

58.     Defendants, directly or indirectly, entered orders for the purchase of a security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of such security, had been or will have been entered by or for the same or different parties for the specific purpose of creating a false or misleading appearance of active trading in such security or the market for such security.

11

59.     Defendants, directly or indirectly, entered orders for the sale of a security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, had been or will have been entered by or for the same or different parties for the specific purpose of creating a false or misleading appearance of active trading in such security or the market for such security.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violations of Section 17(a)(1) of the Securities Act

60.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 59 of the Complaint, inclusive, as if they were fully set forth herein.

61.     By reason of the conduct described above, Defendants, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with the requisite degree of knowledge or state of mind employed devices, schemes, or artifices to defraud.

62.     By reason of the conduct described above, Defendants violated Securities Act Section 17(a)(1) [15 U.S.C. § 77q(a)(1)].

### SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder

63.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 59 of the Complaint, inclusive, as if they were fully set forth herein.

64.     By reason of the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of

12

interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons.

65.     By reason of the conduct described above, Defendants violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## THIRD CLAIM FOR RELIEF
### (Violations of Section 9(a)(1) of the Exchange Act)

66.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 59 of the Complaint, inclusive, as if they were fully set forth herein.

67.     By reason of the conduct described above, Defendants, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, for the purpose of creating a false or misleading appearance of active trading in any security or the market for any such security:  (A) effected a transaction in such security which involves no change in the beneficial ownership thereof, (B) entered an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or (C) entered any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties.

68.     By reason of the conduct described above, Defendants violated Section 9(a)(1) of the Exchange Act [15 U.S.C. § 78i(a)(1)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### **I.**

Permanently restraining and enjoining Defendants from, directly or indirectly, violating Section 9(a) of the Exchange Act [15 U.S.C. 78i(a)]; Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5]; and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

### **II.**

Ordering Defendants to pay civil penalties in accordance with Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

### **III.**

Permanently prohibiting Defendants from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and

## IV.

Granting such other and further relief as this Court may determine to be just, equitable, and appropriate.


Dated:  September 30, 2020

Respectfully submitted,

Christopher R. Kelly
Jennifer Chun Barry
Scott A. Thompson
Burk Burnett

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE
COMMISSION**
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103
Telephone:  (215) 597-3100